## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AYO M. THOMAS,

      *Plaintiff,*

    v.

DISTRICT OF COLUMBIA,

      *Defendant.*

Civil Action No. 13-1551 (RDM)

## MEMORANDUM OPINION

Plaintiff Ayo Thomas brings this action against her now-former employer, the District of Columbia, for alleged violations of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the District of Columbia Family Medical Leave Act, D.C. Code § 32-501 *et seq.* ("DCFMLA"). Thomas alleges that a month after approving her request for medical leave in October of 2012, the District terminated her employment and that, by doing so, the District: (1) interfered with her right to take protected medical leave and (2) retaliated against her for exercising her right to take protected medical leave. *See* Dkt. 1. The District moves for summary judgment on both the interference and retaliation claims, arguing that Thomas's dismissal was based on poor work performance, personality clashes with senior management, and the results of an internal ethics investigation, rather than her request for medical leave. *See* Dkt. 26. Thomas opposes the District's motion and cross-moves for summary judgment on her interference claims. *See* Dkt. 36. For the reasons explained below, the Court will grant the District's motion for summary judgment and will deny Thomas's cross-motion.

## I. BACKGROUND

For the purpose of evaluating the District's motion for summary judgment, the following facts are construed in the light most favorable to Thomas, who is the nonmoving party. *See Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006).

After several years of employment in the District's Office of the State Superintendent of Education, Thomas joined the District's Department of Youth Rehabilitation Services ("DYRS") in January of 2012 as the Human Resources Director. Dkt. 26-3 at 4–5. Thomas's position was at-will, Dkt. 33-9 at 132 (Pl.'s Dep.); Dkt. 26-2 (Def.'s SUMF ¶ 2), and her responsibilities included the daily oversight of "HR operational functions," the supervision of a seven-member human resources team, the "[d]evelop[ment] and implement[ation of] recruitment and workforce development plans," and the "[e]ffective[] resol[ution of] employee grievances," Dkt. 26-3 at 6; Dkt. 33-9 at 19–21, 34–35 (Pl.'s Dep.). In addition, Thomas assisted senior management in filling "high priority positions" within DYRS by creating and maintaining a "recruitment report" and by taking direct responsibility for the "day-to-day recruitment process." Dkt. 33-9 at 27, 33–34 (Pl.'s Dep.); Dkt. 34-3 at 3 (Shorter Dep. 38).

At the start of her employment with DYRS, Thomas's direct supervisor was Chief Operating Officer Christopher Shorter, Dkt. 33-9 at 35 (Pl.'s Dep.); Dkt. 26-3 at 7, who in turn reported to Neil Stanley, the Director of DYRS, Dkt. 26-2 at 3 (Def.'s SUMF ¶ 13). Shorter regularly let Thomas and her team "know that [they] were doing a good job" and gave Thomas "pretty good feedback," Dkt. 33-9 at 36 (Pl.'s Dep.); *see also* Dkt. 34-3 at 3, 8, 24–25 (Shorter Dep. 38, 43, 100, 102) (expressing "satisf[action]" with Thomas's "successful" work), but also discussed with Thomas "the urgency of continuing to fill the vacant positions" at DYRS, Dkt. 33-9 at 36–39 (Pl.'s Dep.); *see also* Dkt. 34-3 at 9–10 (Shorter Dep. 44–45). After Shorter

moved to an "acting chief of staff role" in mid-2012, Regina Youngblood took over as Chief Operating Officer. Dkt. 33-9 at 39–40 (Pl.'s Dep.). Although Thomas's direct supervisor changed, her role and responsibilities did not. *Id.* at 109 (Pl.'s Dep.).

## A.   Thomas's Performance at DYRS in late-2012

Thomas was "never written up for any performance issues" while Youngblood was her supervisor. Dkt. 26-3 at 10; Dkt. 33-9 at 132, 212 (Pl.'s Dep.).  Thomas did, however, receive some feedback from Youngblood and others at DYRS in email correspondence, most notably with respect to a "dashboard" project that required the ongoing submission of entries into a database.  In late-August of 2012, for example, after Thomas told Youngblood that she would be unable to meet a deadline due to a "staff shortage," Youngblood responded that "two very important items . . . now sit with you." Dkt. 41-1 at 2.  A week later, Youngblood sent Thomas a second email asking whether Thomas had "made any progress on completing the file for updating the dashboard" and noting that "we are more than a week behind on our expected delivery date." *Id.* at 1.  About a week later, Youngblood sent another email to Thomas, explaining that "[Stanley] ha[d] communicated his expectation that the dashboard is correct for Monday's report" and that, as they had "been working towards this goal for more than 4 weeks," it was "time to bring this project to a close." Dkt. 41-2 at 1.  Presumably reflecting the ongoing nature of the project, Youngblood emailed Thomas, once again, several weeks later asking "[w]here are we on updating the dashboard numbers" and, once again, stressing the "vital" nature of the task and cautioning that it "must not fall behind again." Dkt. 41-3 at 1.  But, notwithstanding concerns about timing, the work by Thomas's team was well-received.  In mid-October 2012, Youngblood commended the HR team for its "[g]reat work," and a DYRS analyst

"congratulate[d]" Thomas and her "team for the AWESOME job" they were "doing updating" the database. Dkt. 34-1 at 5–6.

Thomas's supervisors also expressed concern about her team's work with DYRS employees and candidates for open positions. In August of 2012, a member of Thomas's team inadvertently included a document containing confidential personnel information about one DYRS employee in a packet meant for another DYRS employee. *See* Dkt. 41-7 at 1–6. After this mistake was discovered, Youngblood assured the director of the D.C. Department of Human Resources that she had "spoken to . . . Thomas[] about this serious oversight"; that "Thomas w[ould] be issuing a letter of admonition to" the offending team member; that "Thomas w[ould] . . . put in place safeguards to ensure [that] this kind of error does not happened in the future"; and that Thomas would call the employee who received the confidential information "to apologize for the error and to reassure her of the safety and security of her medical information." Dkt. 41-7 at 1. Similarly, two months later, the same member of Thomas's team sent a document meant for clearance by DYRS's lawyer directly to the recipient, a "mishap" that Youngblood wrote was "very concerning." Dkt. 41-8 at 1. Youngblood informed Thomas that Stanley's document management "instructions were clear," and, although it was the team member who mistakenly sent the document, "the responsibility l[ay] with [Thomas] because the assignment [had been] given to [her] for completion." *Id.* And, in yet another email, Youngblood informed Stanley that she had "talked with . . . [Thomas] about [her] failure to provide adequate contact and follow-up with respect" to an employment candidate. Dkt. 41-6 at 1.

Finally, another exchange of emails between Youngblood and Thomas revealed tension between Thomas and her supervisors. In that exchange, Youngblood asked Thomas to remove

an "[un]authorized" job posting, and Thomas responded that she had "discussed this" posting

with Stanley. Dkt. 41-10 at 2. Thomas further told Youngblood that she would "not go back and

forth" and that "[Stanley's] directive will be followed." *Id.* A few moments later, Youngblood

responded:

> This isn't a back and forth. As your supervisor I am requesting additional
> information; and if I request additional information I expect you to provide it to me.
> Your email below is hovering very close to insubordination. I would advise you to
> take care to monitor your tone in all communications.

*Id.* at 1. Thomas replied that she was "not sure how [her] email was interpreted as borderline

insubordination" when she had ultimately "agreed to pull down the vacancy" and noted that her

"email tone [w]as stemming from a place of frustration" with "receiving urgent directives from

upper level management" that were "later retracted." *Id.*

**B.    Thomas's Relationship with Stanley**

Early in Thomas's tenure at the agency, Stanley complimented Thomas's work and told

her that "we're glad you're here." Dkt. 33-9 at 47–48, 127–128 (Pl.'s Dep.); Dkt. 34-1 at 1, 3.

Over the course of her employment, however, Thomas came to see Stanley as "very

intimidating" and "very hostile" and, as she explained, her "face to face" meetings with him

"[were]n't always positive." Dkt. 33-9 at 48 (Pl.'s Dep.). At times, Stanley wanted Thomas to

"bypass certain processes" to recruit new employees and, when Thomas informed him that the

agency could not do so, Stanley would "yell[]" and tell her, "I don't care, get it done." *Id.* at 51

(Pl.'s Dep.). At other times, Thomas alleges, Stanley "would give [her] [an assignment]" but

"wouldn't give [her] an opportunity" to complete the necessary work before "calling [her]" to

check in on the status of the assignment. *Id.* at 65 (Pl.'s Dep.).

Tensions also arose when Thomas briefly experimented with an alternative work

schedule. While working from home on her alternative schedule, Thomas received a call from

Stanley, who was "yelling about an employee who did not receive [his or her] reassignment letter." *Id.* at 60–63 (Pl.'s Dep.). After Thomas confirmed that the employee had, in fact, received the letter, Stanley "recommended that [Thomas] stop" using an alternative work schedule and that she "focus on building [her] HR department." *Id.* at 62–63 (Pl.'s Dep.). Thomas, in turn, told Stanley that she was on her first day under the alternative work schedule and that her then-supervisor, Chris Shorter, had approved the schedule. *Id.* at 64 (Pl.'s Dep.). From there, the conversation turned even more confrontational. According to Thomas, Stanley asked her if she "was . . . happy working at DYRS," and Thomas responded that, although she was happy working there, she was "not happy with [Stanley's] aggressive approach towards [her] to resolve issues." *Id.* Faced with this "frank" statement, Stanley told Thomas: "Well, you know, you know who I am. I'm the director, and I can ask . . . any questions. Just take the rest of your day[,] and I'll see you tomorrow." *Id.* Following that incident, Thomas gave up her alternative work schedule. *Id.* at 68–69 (Pl.'s Dep.).

Thomas also alleges that, while she was on sick leave in July 2012, Stanley "called [her] at home and inquired about a hiring action that was already completed." *Id.* at 74–75 (Pl.'s Dep.). After Thomas explained that she had already sent Stanley an email about the action, Stanley asked Thomas if she was "okay." *Id.* at 75 (Pl.'s Dep.). Thomas told him that, in fact, she "wasn't feeling well and was stressed out." *Id.* Stanley then said, "I want you to take a few days off before . . . Youngblood starts," so you will not "have a stale attitude before she comes on board." *Id.* Taking this comment as an unwarranted reprimand, Thomas simply repeated Stanley's words—"stale attitude"—and "told him good bye." *Id.* Rather than run the risk that Stanley would reverse course and hold it against her, Thomas decided not to take any additional time to recover. *Id.*

6

In yet another unpleasant interaction, Thomas alleges that Stanley called her on her "office phone in August 2012" and told her "to keep [her] staff from documenting too much in writing." *Id.* at 90 (Pl.'s Dep.). Thomas responded that extensive documentation was necessary in light of the "many pending legal actions" against the agency. *Id.* Unsatisfied, Stanley "yelled at" Thomas and told her to "stop emailing so much information." *Id.* at 91 (Pl.'s Dep.). To avoid further conflict with Stanley on this issue, Thomas instructed her staff to "use the memo-to-file approach" and to "minimize how much they put in" email. *Id.* at 93 (Pl.'s Dep.).

From all of this, Thomas concluded that Stanley did not like the fact that she asked questions about how he was treating her and that he did not like her "push back." *Id.* at 125 (Pl.'s Dep.). In her view, he was "aggressive towards" her, while she was frank in telling him that she did not "like how" he spoke to her. *Id.* at 124–25 (Pl.'s Dep.). In Thomas's view, Stanley saw her push back as insubordination, and he saw her commitment to "abid[e] by policy and procedures" as ineffectiveness and "as being negative." *Id.* at 127 (Pl.'s Dep.). Ultimately, Thomas recognized that Stanley "started putting [her] under . . . heat, some serious heat," *id.* at 128 (Pl.'s Dep.), and observed that their "relationship . . . went downhill," *id.* at 131 (Pl.'s Dep.).

## C.   The Office of Internal Integrity Investigation

Thomas learned that she was the subject of an investigation by the Office of Internal Integrity ("OII") in the "summer of 2012." *Id.* at 147 (Pl.'s Dep.). The OII investigation was initiated on July 18, 2012, to look into allegations that Thomas: (1) "abus[ed] her power" by "borrow[ing] money" from an employee she directly supervised; and (2) "retaliate[ed] against" that employee by writing a letter of admonishment after the employee asked Thomas to repay the loan. Dkt. 33-10 at 1 (OII Report); Dkt. 26-2 (Def.'s SUMF ¶ 3).

7

In the course of its investigation, the OII interviewed several DYRS employees and determined that Thomas had "allowed [the employee] to pay a registration fee for her and her husband" to attend a spiritual workshop. Dkt. 33-10 at 4, 10. Because Thomas and her husband "did not attend the workshop," Thomas informed the OII investigator that she felt, at first, that "she did not have to repay" the employee," *id.* at 4, but, after receiving an email from the employee requesting repayment, she decided to repay the $80 fee, *id.* at 4–5, 9–10. The OII also found that the day before Thomas repaid the loan, the employee in question had left the DYRS office with the keys to a file cabinet, which prevented the human resources office "from being able to access certain files . . . that were urgently needed." *Id.* at 9. At Thomas's directive, the OII noted, the employee was admonished for this mishap. *Id.* at 11.

"Based on the evidence gathered during [the] investigation," the OII concluded that Thomas had violated a District ethics rule that prohibited an employee from "accept[ing] a gift from an employee receiving less pay than . . . herself," and it thus substantiated the first allegation against Thomas. *Id.* at 10, 12. The OII investigation also determined, however, that the letter of admonishment that Thomas gave to the employee was based on an unrelated performance issue and was not connected to the employee's efforts to obtain repayment of the $80 loan she had made to Thomas. *Id.* at 10. The OII, accordingly, "d[id] not find any evidence that would substantiate [the employee's] allegation that [Thomas] retaliated against her." *Id.* at 11–12. OII Officer "Walter Howell forwarded the completed investigation report to Ms. Youngblood" on October 19, 2012. Dkt. 26-2 (Def.'s SUMF ¶ 7).

**D.    Thomas's Request for Medical Leave**

In August of 2012, Thomas began "experiencing severe abdominal pain, severe ▮▮▮▮▮▮▮▮▮▮▮▮ and [related] fatigue." Dkt. 26-3 at 10. Her doctor diagnosed her with

███████████████████████ *Id.* at 11.  After consultation with her doctor, Thomas decided to

undergo a surgical procedure ███████████████, *id.*, and because the surgery would

necessitate an eight-week recovery period, she met with Youngblood to discuss when she should

schedule the procedure, *id.*; *see also* Dkt. 33-9 at 113 (Pl.'s Dep.).[1]

At that meeting, Thomas asked if she should schedule the surgery for before or after

Christmas.  Youngblood responded that, because the "holidays normally . . . are a little slow,"

Thomas should try to have the surgery done before "the end of [the] year" so she could return to

the office "fresh."  Dkt. 33-9 at 113 (Pl.'s Dep.).  Youngblood further instructed Thomas to

apply for medical leave by "fill[ing] out the information for FMLA approval" and "provid[ing]

the packet to the FMLA Coordinator" for processing.  Dkt. 26-3 at 11; Dkt. 33-9 at 112–13 (Pl.'s

Dep.).  Thomas did so, requesting both "intermittent" leave that would allow her "to call out and

stay home" should she experience acute symptoms prior to the surgery, and "continuous" leave

that would allow her to take time off to "recover[]" from her surgery.  Dkt. 33-9 at 114–15 (Pl.'s

Dep.).  Youngblood approved Thomas's FMLA request on October 1, 2012, granting Thomas

intermittent leave from September 27, 2012, to November 7, 2012, followed by a continuous

---

[1] The Court filed a sealed version of this Memorandum Opinion on December 22, 2016, in order to provide the parties with an opportunity to identify any portions of the Opinion that they believed contained sensitive personal information that should be redacted from the publicly filed version.  The Court concludes that, even in light of "the public's interest in access to judicial information," the clauses redacted in the previous two sentences reflect the sort of personal information in which Thomas maintains a "significant privacy interest."  *John Doe Co. No. 1 v. CFPB*, No. 15-cv-1177 (RDM), 2016 WL 3390677, at *4 (D.D.C. June 15, 2016) (internal quotation marks omitted).  These limited redactions "maximize[] the amount of information available to the public while still protecting the privacy interest [Thomas] assert[s]."  *Id.* (internal quotation marks omitted); *see also United States v. Hubbard*, 650 F.2d 293, 317–21 (D.C. Cir. 1980).

block of leave from November 8, 2012, to December 31, 2012.[2] Dkt. 26-3 at 11–12; Dkt. 33-7 at

1–7; Dkt. 26-2 (Def.'s SUMF ¶ 5).

## E.   Thomas's Termination

While in the office for emergency planning sessions related to Hurricane Sandy in late-

October 2012, Youngblood and Thomas had a conversation about the "personality conflict"

between Thomas and Stanley.  Dkt. 33-9 at 119–20 (Pl.'s Dep.).  During that conversation,

Youngblood "alluded" to the fact "that [Stanley] wanted something different." *Id.* at 124 (Pl.'s

Dep.).  Thomas asked Youngblood if she should "look[] for a job while . . . out on [medical

leave]," and Youngblood responded, "Yes." *Id.* at 120 (Pl.'s Dep.).  As Thomas further

explained in her deposition, Youngblood told her that Stanley did not like the fact that she

pushed back against him. *Id.* at 125 (Pl.'s Dep.).  This did not come to Thomas as a surprise in

light of her earlier conversation with Stanley, when he referred to Thomas's "stale attitude." *Id.*

at 126–27 (Pl.'s Dep.).

The next week, Youngblood once again spoke with Thomas.  Youngblood explained that

she wanted to make the previous week's conversation "a little bit more formal," and she

presented Thomas with a letter of termination. *Id.* at 120–21 (Pl.'s Dep.).  During their

conversation, Youngblood discussed the OII investigation and the one substantiated allegation,

*id.* at 142 (Pl.'s Dep.), but, when Thomas asked if she was "being fired . . . for cause,"

Youngblood explained that the termination was not "for cause" and that Thomas, accordingly,

---

[2]  Although part of Thomas's responsibilities "normally" included "approv[ing]" all agency
FLMA packets," because this packet pertained to Thomas's own FMLA request, the packet was
sent to Youngblood for approval. Dkt. 33-9 at 114 (Pl.'s Dep.).  Thomas explained that
"[d]uring [her] tenure, no employees were separated during FMLA leave approval," Dkt. 26-3 at
13; Dkt. 33-9 at 146–47 (Pl.'s Dep.), and that no one had ever pressured her to "fire somebody
because they were on FMLA leave," Dkt. 33-9 at 147 (Pl.'s Dep.); *see also* Dkt. 26-2 (Def.'s
SUMF ¶¶ 9–10).

would receive severance pay, *id.* at 135–36 (Pl.'s Dep.).  According to Thomas's deposition, Youngblood then added, "[w]e could have terminated you for this, but we're not" doing so.  *Id.* at 142–43 (Pl.'s Dep.).  Youngblood did not elaborate, however, on what she meant by that statement.  *Id.* at 143 (Pl.'s Dep.).  This ambiguity is repeated in Thomas's interrogatory response, where she asserts that Youngblood stated that Thomas "was not being terminated for cause or because of the investigation."  Dkt. 26-3 at 13.

Thomas's termination letter was dated November 1, 2012, falling in the middle of her FMLA intermittent leave period and roughly one week before she was to begin her continuous FMLA leave period.  Dkt. 33-7 at 8–9.  The letter of termination contains no statement of reasons but, rather, merely states that Thomas's employment was "at-will" and that her termination was "neither grievable nor appealable."  *Id.* at 8.  Although Thomas was given the mandatory 15 days' notice of termination, she was placed on immediate administrative leave during the notice period.  *Id.*  Consistent with Youngblood's representations, Thomas was allowed to receive severance pay, along with "any unused annual leave."  *Id.*  Her employment with DYRS, however, came to an end before her FMLA leave would have expired at the end of December 2012.

On October 8, 2013, Thomas filed this suit under FMLA and DCFMLA, alleging that the District interfered with her ability to take medical leave and terminated her employment in retaliation for her request to take medical leave.  *See* Dkt. 1.  The District moves for summary judgment on Thomas's interference and retaliation claims, and Thomas cross-moves for summary judgment on her interference claims.  *See* Dkts. 26, 36.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A fact is *material* if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is *genuine* 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Liberty Lobby*, 477 U.S. at 248) (emphasis added). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, 477 U.S. at 255. Accordingly, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

To defeat a summary judgment motion, however, the nonmoving party must offer more than "a scintilla of evidence," *id.* at 252, or mere "speculation," *Hutchinson v. CIA*, 393 F.3d 226, 229 (D.C. Cir. 2005), in support of her position. Instead, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted), which means that the non-moving party must point to "evidence on which the jury could reasonably find" for her side, *Liberty Lobby*, 477 U.S. at 252. "In essence, . . . the inquiry [is] . . . whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III. ANALYSIS

Under "certain circumstances, the FMLA and its DC counterpart, the DCFMLA, grant an employee the right to take temporary medical leave from employment, without the threat of, or actual termination from her job." *Dorsey v. Jacobson Holman, PLLC*, 756 F. Supp. 2d 30, 33 (D.D.C. 2010). The FMLA, for example, allows an "eligible employee" to take a "total of 12 workweeks of leave during any 12-month period" because of "a serious health condition that makes the employee unable to perform the functions of the position," 29 U.S.C. § 2612(a)(1)(D), while the DCFMLA permits an employee to take a total of "16 workweeks" of medical leave over "any 24-month period," D.C. Code § 32-503(a).

"The FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he was engaged in activity protected by the Act, *see* 29 U.S.C. § 2615(a)(1) & (2)." *Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146, 152 (D.D.C. 2012) (quoting *Strickland v. Water Works and Sewer Bd. of the City of Birmingham*, 239 F. 3d 1199, 1206 (11th Cir. 2001)). Although "the text of the FMLA does not clearly label these two claims as ones for 'retaliation' and 'interference,' 'those are the labels courts have used in describing an employee's conduct under the Act.'" *Id.* at 152 n.6 (quoting *Strickland*, 239 F.3d at 1207 n.9). "Claims under the DCFMLA similarly include claims for interference and claims for retaliation," *Alford v. Providence Hosp.*, 945 F. Supp. 2d 98, 105 (D.D.C. 2013) (citing D.C. Code § 32-507(a) (interference) and D.C. Code § 32-507(b)(1) (retaliation)), and courts regularly analyze both the FMLA and the DCFMLA under the same legal framework, *see, e.g., id.* at 105–08; *Thomas v. District of Columbia*, No. 14-cv-335 (APM), 2016 WL 3919822, at *4 (D.D.C.

July 18, 2016) (recognizing that "DCFMLA's theories of recovery parallel the FMLA's"). For

present purposes, moreover, the parties agree that the same legal analysis applies to both the

FMLA and the DCFMLA. *See* Dkt. 26-1 at 4; Dkt. 33-1 at 11. The Court, accordingly, treats

Thomas's FMLA and DCFMLA claims together, and for the sake of simplicity, refers only to the

FMLA in the remainder of this opinion.

The Court will first address Thomas's retaliation claims and will then turn to her

interference claims.

## A.   Retaliation Claims

Under the FMLA, the "prohibition against interference prohibits an employer from . . .

retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights."

29 C.F.R. § 825.220(c).[3]   "[E]mployers cannot," for example, "use the taking of FMLA leave as

---

[3] There is some disagreement in this district regarding whether a retaliation claim of this type arises under § 2615(a)(1) or (a)(2). *Compare Elzeneiny v. District of Columbia*, 2016 WL 3647838, at *5–8 (D.D.C. July 1, 2016) (analyzing an FMLA interference claim under § 2615(a)(1) and an FMLA retaliation claim under § 2615(a)(2)), *with Hopkins*, 851 F. Supp. 2d at 152 (noting that § 2615(a)(1) covers both retaliation and interference claims, and using "the term retaliation" to "describe prohibited . . . retaliatory conduct under the Act, whether it is under § 2615(a)(1) or § 2615(a)(2)"). In *Roseboro v. Billington*, for example, the court describes a "retaliation claim under § 2615(a)(2)" as a claim "in which the employer has taken adverse action against the employee because the employee took leave or otherwise engaged in activity protected by [FMLA]." 606 F. Supp. 2d 104, 107–08 (D.D.C. 2009). But the text of § 2615(a)(2) is not so broad; it states only that it "shall be unlawful for any employer to discharge . . . any individual for *opposing* any practice made unlawful by this subchapter" (emphasis added). In the Court's view, § 2615(a)(2) applies only in cases in which an employer takes some adverse action against an employee based on the employee's opposition to a practice made unlawful by the FMLA. In contrast, in cases—like this one—in which the employer is alleged to have taken some adverse action against the employee based on the employee's exercise of her rights under the FMLA, the claim arises under § 2615(a)(1), which bars employers from interfering with the exercise of rights protected under the FMLA. *See Bachelder v. Am. West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) ("By [its] plain meaning, the anti-retaliation . . . provision[] do[es] not cover visiting negative consequences on an employee simply because he has used FMLA leave. Such action is, instead, covered under § 2615(a)(1), the provision governing 'Interference [with the] Exercise of rights.'"). For present purposes, however, it is sufficient to note that neither party disputes that—whether premised on

a negative factor in employment actions, such as . . . disciplinary actions." *Id.* Thomas alleges

that the District did just that, terminating her employment with DYRS "in retaliation for

ex[er]cising and/or attempting to ex[er]cise her right to take approved leave" under the FMLA.

Dkt. 1 (Compl. ¶¶ 56, 67). The District, in contrast, argues that Thomas was "terminated for

legitimate, non-retaliatory reasons": an "ethical violation," "personality conflicts" with her

supervisor, and "work performance issues." Dkt. 26-1 at 4, 7.

In analyzing FMLA retaliation claims, "courts apply the burden-shifting framework

adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Roseboro*, 606 F. Supp.

2d at 109. Under that framework, an "employee may establish a prima facie case creating a

presumption of retaliation" by showing "(1) that he exercised rights afforded by the [FMLA], (2)

that he suffered an adverse employment action, and (3) that there was a causal connection

between the exercise of his rights and the adverse employment action." *Id.* (internal quotation

marks omitted). If the employee makes this prima facie showing, the employer may overcome

the presumption of retaliation by "producing evidence of a legitimate, non-discriminatory reason

for its action." *Id*

Once an employer has proffered some legitimate non-retaliatory reason for its action,

however, "the district court need not—*and should not*—decide whether the plaintiff actually

made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms*,

520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).[4] Rather, the "central question at

---

§ 2615(a)(1) or (a)(2)—the FMLA bars an employer from terminating an employee merely
because the employee has, or has attempted to, exercise her right to take FMLA leave.

[4] Although *Brady* and other cases cited below involve claims arising under Title VII, the D.C.
Circuit has held that the "analytical framework for [a] claim of retaliation" under FMLA is "the
same as that applicable to a claim of discrimination under Title VII." *McFadden v. Ballard
Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 6 (D.C. Cir. 2010).

summary judgment becomes whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted . . . non-retaliatory reason was not the actual reason and that the employer intentionally . . . retaliated against the employee." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (internal quotation marks omitted). "A plaintiff opposing summary judgment may raise an inference that the employer's purpose was retaliatory by pointing to evidence attacking the employer's proffered reasons, together with other evidence, if any, suggesting that retaliation was the real reason." *Allen v. Johnson*, 795 F.3d 34, 39–40 (D.C. Cir. 2015). Whether "the available evidence suffices to support a jury finding of retaliation will, necessarily, be a contextual judgment." *Id.* at 40.

Here, there is no dispute that Thomas has made a prima facie showing of retaliation or, more importantly, that the District has responded to that showing by proffering three non-retaliatory reasons for Thomas's termination. *See* Dkt. 26-1; Dkt. 33-1 at 2. As a result, the crux of the issue before the Court is whether Thomas has demonstrated that there is a genuine dispute of material fact about whether those stated grounds are pretextual and whether the District, in fact, fired Thomas because she took, or sought to take, FMLA leave. *See Roseboro*, 606 F. Supp. 2d at 109. In an effort to make this showing, Thomas takes two tacks: First, she seeks to undermine the District's stated rationales for her termination by claiming that the "excuses postulated . . . lack credibility and are pretext," *see* Dkt. 33-1 at 2, 14–25, and second, she highlights other facts that, she suggests, show that the District retaliated against her for taking FMLA leave, *see id.* at 28–32.

1. *The District's Proffered Reasons for Thomas's Termination*

The District proffers three "legitimate, non-discriminatory reasons" for Thomas's termination. Dkt. 26-1 at 7, 9. First, the District highlights Thomas's "work performance

issues" and the negative feedback she received from her DYRS supervisors. *Id.* at 2, 7; *see also* Dkt. 40 at 8–11. Next, it argues that Thomas and DYRS Director Stanley "had personality conflicts" that led to Thomas's termination. Dkt. 26-1 at 2, 5–7. Finally, the District points to the results of the OII investigation and claims that Thomas's "lack of judgment in accepting a loan from a subordinate, which was clearly against [DYRS's] ethics policy[,] . . . was sufficient reason to terminate [Thomas's] employment." Dkt. 26-1 at 5. Thomas contends that all three asserted reasons for her termination are pretextual.

In the ordinary course, a plaintiff alleging that her employer acted for unlawful, retaliatory reasons may avoid summary judgment by identifying evidence from which a reasonable jury could find that her employer's proffered, lawful reasons for acting "were pretextual," *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999), or, in other words, "unworthy of credence," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "Showing pretext, however, requires more than simply criticizing the employer's decisionmaking process." *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014). It is not sufficient to "show that a reason given for a job action [was] not just, or fair, or sensible," nor is it sufficient to challenge "the correctness or desirability of [the] reasons offered." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotation marks omitted). The plaintiff must show—or, at summary judgment, must identify evidence from which a reasonable jury could find—that her employer's stated reasons were "phony." *Id.* Based on the record before the Court, however, the Court concludes that no reasonable jury would find that the District's stated justifications for Thomas's termination were pretextual.

As an initial matter, the Court notes that the fact that the termination letter that DYRS provided to Thomas contained no explanation for the office's action does not preclude the

District from offering reasons now.  A plaintiff can, of course, "meet his burden of proving pretext with evidence that 'the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision." *Francis v. Dist. of Columbia*, 731 F. Supp. 2d 56, 72 (D.D.C. 2010) (quoting *Aka v. Wash. Hosp. Center*, 156 F.3d 1284, 1295 (D.C. Cir. 1998)).  But "[a]n employer need not explain its reasons for firing an at-will employee without cause," and the fact that "it eventually does so during discovery does not establish pretext." *Id.* (citing *Bennett v. Chertoff*, 425 F.3d 999, 1002–03 (D.C. Cir. 2005)). Nor does the fact that Youngblood offered a less than complete explanation for terminating Thomas during their November 2012 conversation establish pretext.  Youngblood "alluded to" the fact that Stanley "wanted something different," Dkt. 33-9 at 124 (Pl.'s Dep.), and Youngblood and Thomas discussed the difficulties that existed between Thomas and Stanley, *id.* at 119–20, 124–27 (Pl.'s Dep.).  Youngblood also provided Thomas with a copy of the OII investigation report and told her that one of the allegations had been substantiated.  *Id.* at 121, 142 (Pl.'s Dep.).  And, although Youngblood indicated that Thomas was not being "fired for cause," she did not "go into details." *Id.* at 143 (Pl.'s Dep.).  Thomas questions much of this, and she challenges the credibility of the reasons the District offers in support of its decision to end her employment.  But she points to no evidence suggesting that the District ever purported to provide a full explication of the reasons for its action in either the termination letter or in the course of Thomas's conversations with Youngblood.

Instead, Thomas focuses much of her argument on perceived weaknesses in each of the three rationales on which the District now relies:

(a) Work Performance and Personality Conflict

The District's first two asserted non-retaliatory reasons for ending Thomas's employment are closely related—it contends that Thomas's work performance was deficient and that she did not get along with her ultimate supervisor, Neil Stanley. As to each, Thomas has failed to carry her burden of identifying evidence from which a reasonable jury could find pretext.

Thomas first argues that the District has failed to offer any "written documentation" of these "alleged performance deficiencies and/or 'personality conflicts with . . . Stanley [that] would have been reason for terminating . . . Thomas." Dkt. 47 at 4. That is not correct. With respect to the asserted performance deficiencies, it is true that Thomas did not receive negative reviews in any formal evaluations, Dkt. 33-1 at 7 (citing Dkt. 33-9 at 132 (Pl.'s Dep.)), and it is true that she, at times, received compliments on her work, Dkt. 33-1 at 4 & n.2 (citing Dkt. 34-1 at 1–6). But the District has, in fact, produced evidence that Thomas's work, and the work of those she supervised, was subject to criticism in the months preceding her termination. Youngblood emailed Thomas on multiple occasions, for example, about missed deadlines and incomplete assignments.[5] There is evidence that Thomas and another employee "fail[ed] to provide adequate contact and follow-up with respect" to a job applicant.[6] There is evidence that

---

[5] *See, e.g.*, Dkt. 41-1 at 1 (Youngblood to Thomas, August 29, 2012: "Have you made any progress on completing the file for updating the dashboard? At this point we are more than a week behind on our expected delivery date."); Dkt. 41-3 at 1 (Youngblood to Thomas, October 30, 2012: "Where are we on updating the dashboard numbers? This is a vital task that must not fall behind again."); Dkt. 41-5 (Youngblood to Thomas, October 19, 2012: "By the way, you previously advised that a draft of the PD would be provided by COB yesterday but it was not delivered. When will I receive the updated PD?"); *see also* Dkt. 41-4 at 1 (Sinks email, September 21, 2012: "I have requested this information from Ms. Thomas several times. I was informed that I would receive the information by our deadline of September 17th, but I have still not received it after repeated requests.").

[6] *See* Dkt. 41-6 at 1 (Youngblood to Stanley, October 24, 2012).

a member of Thomas's staff mistakenly placed a confidential personnel document of one employee inside a mailing to another employee—an oversight that required Thomas to "call" and "apologize for the error,"[7] and that that same staff member accidentally forwarded a document that was meant for DYRS's counsel directly to an employee, a "mishap [that] [wa]s very concerning" to Youngblood.[8]  With respect to the last of these errors, moreover, Youngblood made clear that she held Thomas responsible "because the assignment [had been] given to [Thomas] for completion."[9]  Finally, just three days before her termination, Thomas sent a memorandum to the "DC Department of Human Resources" responding to a "compliance audit" of her office in which she admitted to "errors" made by "DYRS Human Resources" that stemmed from a "lack of knowledge and understanding" by members of her staff. Dkt. 41-11 at 1–2.

Thomas is on even weaker ground in arguing that the District has failed to offer documentation of the asserted interpersonal clashes between her and Stanley. Dkt. 47 at 4.  If she means by this that there is no proof of these clashes, the Court need look no further than her own deposition to disagree. She testified, for example, that Stanley yelled at her on a number of occasions, *see, e.g.,* Dkt. 33-9 at 61–62, 91 (Pl.'s Dep.); that he suggested that Thomas had a "stale attitude," *id.* at 75 (Pl.'s Dep.); and that their "face to face" meetings "[were]n't always positive," *id.* at 48 (Pl.'s Dep.).  More significantly, she testified that she "push[ed] back" at times and that Stanley did not like it when she did so. *Id.* at 125, 127 (Pl.'s Dep.). One conversation, for example, devolved to a point at which Stanley asked Thomas whether she "was

---

[7] *See* Dkt. 41-7 at 1–2 (Youngblood correspondence with Shawn Stokes, August 31, 2012).

[8] *See* Dkt. 41-8 at 1–2 (Youngblood to Thomas, October 12, 2012).

[9] *See id.* at 1.

happy working at DYRS," and she answered that, while she liked her job, she was "not happy with [Stanley's] aggressive approach towards [her]." *Id.* at 64 (Pl.'s Dep.). Stanley, in turn, responded, "Well, you know, you know who I am. I'm the director, and I can ask . . . any questions." *Id.* As Thomas apparently recognized, this was not a healthy relationship. *See, e.g. id.* at 48–49 (Pl.'s Dep.) ("I've had meetings where I've cried in meetings because he's very intimidating. His approach is very hostile[.] . . . He pretty much talked to me like I was nothing[.]").

Rather than disputing the existence of these clashes, Thomas is perhaps better understood to maintain that it was Stanley who was out of line and that he answered her legitimate desire "to abide by HR policies and procedures," Dkt. 33-1 at 16, with inappropriate hostility and unduly aggressive behavior, Dkt. 33-9 at 90–93, 127 (Pl.'s Dep.). It was Stanley who developed a "hit list" of those employees who pushed back in response to his demands. *Id.* at 127 (Pl.'s Dep.). It was Stanley, in Thomas's view, who had a poor management "style," who "degrade[d] other employees in meetings," *id.* at 48 (Pl.'s Dep.), who was subject to criticism by "several employees, including managers," for his "hostile leadership approach, *id.* at 94 (Pl.'s Dep.), and who drove others from DYRS due to his "hostile approach," *id.* at 95 (Pl.'s Dep.). But, even if accurate, these assertions miss the point. The relevant question is not whether Stanley was a difficult boss who unfairly clashed with Thomas over proper adherence to HR policies, but whether Thomas was terminated for seeking to exercise her FMLA rights. The contention that Stanley was aggressive and overbearing does not show that the District's proffered, non-retaliatory reason for Thomas's termination is pretextual, but rather, if anything, strengthens the District's position that Thomas was fired for reasons unrelated to the FMLA.

Nor is the absence of official documentation of Thomas's performance deficiencies or clashes with Stanley sufficient to establish pretext. Dkt. 47 at 4–5. Thomas is correct that an "employer's failure to follow established procedures or criteria" can, at times, support a finding of pretext. *Brady*, 520 F.3d at 495 n.3. She has failed to demonstrate, however, that DYRS was required to take these steps before ending her employment. As a member of the Management Supervisory Service ("MSS"), Thomas was an at-will employee. D.C. Code § 1-609.54; *see also* Dkt. 33-9 at 132 (Pl.'s Dep.); Dkt. 26-2 (Def.'s SUMF ¶ 2). Members of the MMS are, in general, subject to chapter 14 of the D.C. personnel regulations, which, among other things, require a supervisor to prepare a performance improvement plan "when employee performance has been observed by the supervisor as being deficient." D.C. Mun. Regs. Tit. 6-B § 1410.4. But they are not subject to chapter 16, which governs adverse employment actions, including termination actions due to failure to meet the requirements of a performance improvement plan. *Id.* § 1600.3(g) (2012).

Moreover, even if the District failed to follow its own regulations, that omission standing alone "'may not be sufficient to support' the conclusion that [DYRS's] explanation for the challenged employment action [was] pretextual." *Fischbach*, 86 F.3d at 1183 (quoting *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982)). Given Thomas's status as an at-will employee, no reasonable jury could conclude that DYRS's failure to engage in performance counseling or to issue a performance improvement plan was "an error too obvious to be unintentional." *Id.* To the contrary, even if the District could have done a better job of documenting Thomas's performance issues, could have provided her with more formal notice of the need for improvement, and could have done more to document her clashes with Stanley, she was an at-will employee who was provided with actual notice of concerns as they arose. Indeed, the record

before the Court reflects that Thomas received multiple emails from her supervisor timely raising performance-related issues, *see, e.g.*, Dkt. 41-1 at 1; Dkt. 41-2 at 1; Dkt. 41-3 at 1, Dkt. 41-5 at 1; Dkt. 41-8 at 1, and Thomas concedes that she was not surprised when Youngblood told her that Stanley did not like her or their interactions, Dkt. 33-9 at 126–27 (Pl.'s Dep.). And, most importantly, there is no evidence whatsoever that the District's real purpose was to retaliate against her for taking FMLA leave. To the contrary, even when viewed in the light most favorable to Thomas, what the record reveals is an unreasonable supervisor who did not like it when his subordinates pushed back, even when they had good reason to do so, and a series of performance criticisms, even if modest in nature and expressed with insufficient formality or clarity. It is not enough, however, to show that an employer was unfair, vindictive, or otherwise unreasonable in its dealings with the plaintiff. *See Fischbach*, 86 F.3d at 1183. What matters is whether there is any basis to believe that the asserted non-retaliatory reasons for the employer's actions are false. *Id.* Here, there is not.

(b) OII Investigation Report

The District posits that Thomas was also fired in light of the Office of Internal Integrity's finding that Thomas violated a D.C. ethics rule by accepting a gift (or loan) from an employee compensated at a lower level than she was. Dkt. 26-1 at 5; Dkt. 40 at 11–15. The OII investigation was initiated in July of 2012—well before Thomas applied for FMLA leave—and was not finalized until October 19, 2012—nearly three weeks after Youngblood approved Thomas's FMLA leave and less than two weeks before the District terminated her employment. *See* Dkt. 33-10 at 1; Dkt. 33-7 at 5–7. The investigation substantiated an allegation that "Thomas allowed [a subordinate employee] to pay a registration fee for her and her husband and later repaid [that employee], . . . a violation of the DYRS Employee Conduct Policy and the

corresponding District's Ethics Policy." Dkt. 33-10 at 10. Thomas argues that the District's reliance on the OII investigation is pretextual for several reasons.

As an initial matter, it is unclear whether a factual dispute about whether this *one* asserted justification were pretextual would be sufficient to defeat the District's motion for summary judgment. There is support for the proposition that a plaintiff must "demonstrate that *each* of [her employer's] proffered nonretaliatory reasons for the termination of [the plaintiff's] employment was pretextual." *Kirk v. Small*, No. 03-5360, 2004 WL 1249294, at *1 (D.C. Cir. June 7, 2004) (mem.) (emphasis added); *see also Brown v. Vance-Cooks*, 920 F. Supp. 2d 61, 70–71 (D.D.C. 2013) ("Summary judgment should be granted for an employer where an employee cannot demonstrate that every proffered nonretaliatory reason for the termination was pretextual."); *Hairston v. Boardman*, 915 F. Supp. 2d 155, 161 (D.D.C. 2013) ("To defeat a Title VII defendant's summary judgment motion, a plaintiff must demonstrate pretext as to all of the defendant's proffered neural explanations, not just some of them."); *Hicks v. Gotbaum*, 828 F. Supp. 2d 152, 162 (D.D.C. 2011) (same). To be sure, that rule applies only where the nonpretextual rationale, standing alone, "would have caused the [employer] to take the action of which the plaintiff is complaining," *Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995), and where the reasons are not "intertwined or pretext is [not] otherwise obvious," *Kirk*, 2004 WL 1249294, at * 1. Here, pretext is not obvious, and, indeed, there is no direct or indirect evidence that Thomas's FMLA leave played any role in her termination. It is not entirely clear from the present record, however, whether DYRS would have terminated Thomas based *solely* on her performance deficiencies and conflicts with Stanley, even in the absence of the OII's findings. The District's interrogatory responses hint at that conclusion, asserting that Thomas was terminated for the performance and personality issues discussed above, and that,

"*[a]dditionally*," she "was the subject of an internal investigation . . . , which . . . found that she violated the District Employee Code of Ethics." Dkt. 26-5 at 4 (emphasis added). Drawing all reasonable inferences in favor of the nonmoving party, however, the Court cannot, at least on the current record, foreclose the possibility that the ethics charge was "intertwined" with the other asserted bases for terminating Thomas's employment with DYRS. But, even if the three rationales were, in fact, intertwined, there is no evidence that would allow a reasonable jury to find that the District's reliance on the ethics charge was pretextual.

Thomas argues that "it is undisputed that [the District] did not terminate . . . [her] because of the [OII] investigation[,] and therefore [the District's] contention that the OII investigation provided a reason for her termination must fail." Dkt. 33-1 at 21. In support, Thomas relies on two pieces of evidence: the District's responses to her interrogatories, *id.* at 21–22 (citing Dkt. 26-5 at 7), and her responses to the District's interrogatories, *id.* at 22 (citing Dkt. 26-3 at 13). Neither submission, however, would permit a reasonable jury to find that the OII investigation played no role in the decision to end Thomas's employment with DYRS, and neither would support a finding of pretext.

Nothing in the District's interrogatory responses is at odds with its current contention that the OII investigation was one factor DYRS took into account in deciding to terminate Thomas. To the contrary, just as the District now argues, those interrogatory responses assert that Thomas was "removed from her position" based on performance issues, her failure "to follow directives from her superiors" and to "accept constructive feedback," and the OII investigation. Dkt. 26-5 at 4. Rather than focus on this response, which was given to an interrogatory specifically requesting the reasons for the District's action, Thomas relies on an interrogatory seeking support for the contention that Thomas "was *disciplined* as a result of the" OIIs' findings. *See*

Dkt. 33-1 at 21–22 (quoting Dkt. 26-5 at 7 (emphasis added)). In response, the District

explained that it was "not making any such contention, although [Thomas] could have been

disciplined" based on the OII findings. Dkt. 26-5 at 7. The District further explained that,

"while [Thomas] was separated as an MSS at-will employee and not for cause, the substantiated

OII investigation against her and other performance-related issues supported the District's

decision to terminate [Thomas]." *Id.* The unmistakable import of these responses is that

Thomas was not subject to the type of disciplinary proceeding that would support a for-cause

removal and that, instead, she was removed at will, based on the dissatisfaction of her superiors.

Thomas's own deposition testimony bears this out. According to Thomas, Youngblood

told Thomas that she was not being fired for cause and that, as a result, she would still qualify to

receive severance pay. Dkt. 33-9 at 135–36. That statement, in turn, was consistent with D.C.

personnel law, which precludes an award of severance pay to an employee terminated for

disciplinary reasons, but allows such a payment for employees terminated at will. D.C. Code

§ 1-609.54(b). Reasonably construed, what the District conveyed in its interrogatory responses,

and what Youngblood told Thomas, was that Thomas was not subject to any formal discipline,

and she was not terminated for cause. Rather, as an at-will employee, she was terminated at the

discretion of her supervisors.

The conclusion that Thomas was not terminated "for cause," however, does not mean that

she was terminated "without reason." Under D.C. personnel rules, District employees that are

part of the "Career Service" can only be removed "for cause," D.C. Code § 1-608.01(a)(13), and

the types of employee actions or transgressions that qualify as "for cause" are enumerated in the

D.C. regulations, *see* D.C. Mun. Regs. Tit. 6-B § 1605.4. The parties agree, however, that MSS

employees like Thomas are "at-will" employees and can be terminated for any reason, so long as

that reason is not otherwise illegal. *See* Dkt. 26-2 (Def.'s SUMF ¶ 2); Dkt. 33-9 at 132 (Pl.'s

Dep. 132) ("At-will means that you can be terminated at any time."); *see also* D.C. Code § 1-

609.54. Here, the District has articulated its reasons for terminating Thomas, and the fact that

Thomas was not subject to a disciplinary action or removed for cause does not cast doubt on the

veracity of those reasons.

Thomas's reliance on her own responses to the District's interrogatories presents a

slightly closer question, but still fails to give rise to a genuine dispute of material fact. In those

responses, Thomas asserts that Youngblood informed her that she "was not being terminated for

cause *or because of the investigation*." Dkt. 26-3 at 13 (emphasis added). Standing alone, the

second clause of this response might support a claim that Youngblood expressly disavowed the

argument that the District now makes—that is, that the OII finding of an ethical breach was an

"additional[]" factor that DYRS weighed in deciding to end Thomas's at-will employment. *See*

Dkt. 26-5 at 4. Thomas's deposition testimony, however, clarifies what she contends was said—

and what was left unsaid—in her conversation with Youngblood. According to that testimony,

Youngblood came to Thomas's office with "a folder in her hand." Dkt. 33-9 at 120 (Pl.'s Dep.).

Youngblood reminded Thomas about the conversation that they had previously had, in which she

suggested that Thomas look for a new job, and Youngblood explained that she now wanted "to

make it a little bit more formal." *Id.* Youngblood then opened the folder, which contained both

a termination letter and the OII investigation report. *Id.* at 120–21 (Pl.'s Dep.). Thomas asked

whether she was "being terminated for cause," and Youngblood said, "No, you're not being

terminated for cause. This is just a decision that the agency wants to make." *Id.* at 122 (Pl.'s

Dep.); *see also id.* at 135–36 (Pl.'s Dep.) ("[I asked,] 'Why am I being fired? Is this for cause,'

you know? And she said, 'No, you're not being terminated for cause.'").

Later in her deposition, Thomas was again asked about her conversation with Youngblood. At this point, Thomas acknowledged that Youngblood discussed the OII's findings during their conversation and that Youngblood told her that "one part of the investigation was substantiated." *Id.* at 142 (Pl.'s Dep.). It was in this context that Youngblood allegedly said, "We could have terminated you for this, but we're not." *Id.* at 142–43 (Pl.'s Dep.). And, finally, when asked whether Youngblood "was . . . saying [that Thomas] could have been fired for cause because of this, but [DYRS was] not firing [her] for cause," Thomas simply testified that Youngblood "didn't go into details." *Id.* at 143 (Pl.'s Dep.).

Considered in this context, no reasonable jury could conclude that this conversation between Youngblood and Thomas supports a finding that the District's reliance on the OII's findings was pretextual. Youngblood went to Thomas's office to tell her that she was fired. She had two documents in hand—the termination letter and the OII report. She explained to Thomas that the OII had found that she violated the D.C. ethics rules. Youngblood and Thomas discussed the fact that Thomas would qualify for severance pay, which is unavailable when an employee is discharged for cause. And Thomas conceded at her deposition that Youngblood did not "go into details" about what she meant when she told Thomas that they "could have terminated" her for the ethical violation, "but we're not." *Id.* at 142–43 (Pl.'s Dep.). Although inconsistency in an employer's explanation for why it took an adverse action "may cast doubt on the employer's proffered reason," *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."), the relevant inquiry must focus on Thomas's testimony as a whole, and not on an isolated sentence or clause, *see Lathan v.*

*Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) ("[T]o survive summary judgment the plaintiff must show that a reasonable jury could conclude *from all of the evidence* that the adverse employment action was made for a discriminatory reason.") (emphasis added).  Here, considered in that light and along with the other evidence before the Court, no reasonable jury could find (1) that Youngblood went to Thomas's office to fire her, brought along a copy of the OII's findings, and even summarized those findings for Thomas, yet did so solely for the purpose of clarifying that those findings had nothing to do with the decision to end Thomas's employment; (2) that the District subsequently resurrected the OII findings as a *third* reason for terminating Thomas, knowing that Thomas was, in fact, terminated for other reasons; and (3) that this deception proves that Thomas was actually fired in retaliation for exercising her rights under the FMLA.

Thomas also challenges the OII's finding that she committed an ethical misstep, arguing that there was "scant factual support" that she actually accepted a "gift" from a subordinate employee.  Dkt. 33-1 at 22–23.  Again, this argument misses the mark.  The OII report notes that Thomas, in a "face-to-face interview," admitted that she "reluctantly agreed to allow [the subordinate employee] to pay the registration fees for her and her husband" and "felt that she did not have to repay [the employee] because she and her husband did not attend the workshop." Dkt. 33-10 at 4.  In her deposition, Thomas claimed she never *asked* the employee to pay the fee, *see* Dkt. 33-9 at 149–50 (Pl.'s Dep.), but she never challenges the OII finding that she "*agreed to allow*" a subordinate employee to pay the fee, Dkt. 33-10 at 10 (emphasis added), and she admits that "she reimbursed the money to avoid any workplace issues," Dkt. 33-1 at 24.  But, more importantly, even if the OII's finding is erroneous or unfair, "[t]he question is not whether the underlying . . . incident occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying . . . incident occurred." *Brady*, 520 F.3d at 496.  Here,

Thomas has presented no evidence to suggest that her supervisors had any reason to doubt the validity of the OII's finding, nor has she shown that the report was so "egregiously wrong" or "unsystematic and incomplete" that a reasonable jury could infer that DYRS's reliance on it was a ruse to hide its actual, unlawful reason for ending Thomas's at-will employment.[10]  *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

Finally, Thomas's efforts to cast doubt on the OII investigation by asserting that she (or one of her subordinates) was told by certain former employees that "the allegations were falsely substantiated," Dkt. 33-9 at 157 (Pl.'s Dep.), and that Stanley pressured the investigators "[t]o close out the investigation," *id.*, amount to hearsay, double hearsay, and (possibly) even triple hearsay.  Although "a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence."  *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).  Under this rule, "[o]nly that portion of a deposition that would be admissible in evidence at trial may be introduced on [a summary judgment] motion," 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2722 (4th ed. 2016), and because Thomas's "evidence about the conversation[s] is sheer hearsay[,] she would not be permitted to testify about the conversation[s] at trial," *Gleklen*, 199 F.3d at 1369.  Because these statements cannot be "presented in a form that would be admissible in evidence" at trial, they cannot aid Thomas at this stage of the proceeding.  Fed. R. Civ. P. 56(c)(2).

---

[10]  Thomas's reliance on a D.C. Ethics Manual (updated in 2014) and an advisory opinion (circulated in 2013) to argue that her actions did not actually violate the District's ethics rules, *see* Dkt. 33-1 at 24 (citing to Dkt. 33-10 at 13–21), fails for similar reasons, and, in any event, these sources post-date the 2012 OII report.

2. *Circumstantial Evidence and Temporal Proximity*

Aside from challenging her employer's proffered reasons for taking an adverse action, a plaintiff asserting a retaliation claim may also defeat a motion for summary judgment by identifying "other evidence . . . suggesting that retaliation was the real reason" her employer acted. *Allen*, 795 F.3d at 40. In an effort to do so, Thomas directs the Court to "circumstantial evidence" that she claims would permit a reasonable jury to find that the District's "proffered explanation is false," Dkt. 33-1 at 29–32, and also argues that the "temporal proximity . . . between the time when DYRS approved [Thomas's] FMLA leave and her termination" would allow a reasonable jury to infer that the District retaliated against Thomas for requesting FMLA leave, Dkt. 33-1 at 28.

Thomas first argues that Stanley and Youngblood "were long aware of [Thomas] having medical issues and taking leave" and, armed with that knowledge, the pair "hatched" a plan "to terminate her once she formalized her need for medical leave through her FMLA request." Dkt. 33-1 at 30. Thomas is correct that her supervisors were aware of her medical issues; Stanley knew, for example, that Thomas took three days off to deal with an illness in May of 2012, *see* Dkt. 34-2 at 1, and Youngblood, who knew more of the specifics than Stanley, asked another DYRS employee to help out if "[Thomas] [wa]s unable to respond to emails due to illness," *id.* at 2. The fact that Stanley and Youngblood knew that Thomas was ill, however, adds nothing to her claim; indeed, in virtually every FMLA case, the plaintiff's employer knows that the employee or a close family member has a serious health condition or is in need of care. *See, e.g.*, 29 U.S.C. § 2613(a) (allowing employers "to require that a request for [FMLA] leave . . . be supported by a certification issued by [a] health care provider"). Nor is there *any* evidence that Stanley and Youngblood plotted for months, simply waiting for Thomas to submit a formal

request for leave before executing on their plan to fire her in retaliation for seeking leave.  To the contrary, the record shows that, if anything, Youngblood sought to accommodate Thomas's health issues by ensuring that Thomas's responsibilities were handled in her absence by another staff member.  *See* Dkt. 34-2 at 2.  And, although Thomas asserts that Stanley chastised her for having a "stale attitude" when he called her while she was out sick in July of 2012, *see* Dkt. 33-9 at 75, 79 (Pl.'s Dep.), as Thomas acknowledged in her deposition, that comment was prompted by her evident "irritat[ion]" at Stanley's call, *id.* at 79 (Pl.'s Dep.), and not by Stanley's knowledge of her long-term medical condition, which Thomas did not disclose to him at that time, *id.*

Thomas also points to an email exchange between Youngblood and DCHR Director Shawn Stokes that, she argues, "demonstrates that the reasons given for the termination are pretext and unworthy of belief."  Dkt. 33-1 at 32.  In those emails, Stokes asked Youngblood if Thomas was on approved intermittent FMLA leave when she was terminated, and four minutes later, Youngblood responded that she did not "have any knowledge of any approved intermittent FMLA."  Dkt. 34-2 at 5.  Stokes then explained that she wanted to be "absolutely sure" that Thomas's intermittent leave had not yet started, and about ten minutes later, Youngblood responded that she "went back and double checked the paperwork," confirmed that Thomas had requested FMLA intermittent leave, and "apologize[d] for the confusion."  *Id.* at 4.  The entire back-and-forth lasted fifteen minutes.

Thomas claims that the emails show an "attempt at a cover-up by . . . Youngblood" because, even though Youngblood had signed the paperwork approving Thomas's intermittent FMLA leave, she "lied when she responded" to Stokes by telling her that she had no knowledge of such leave.  Dkt. 33-1 at 31–32.  Although Thomas does not quite connect the dots, she seems

32

to suggest that Youngblood knew DYRS should not have terminated Thomas while she was on intermittent FMLA leave, sought to hide that fact from Stokes, and came clean only when pressed. But no reasonable jury would reach such a conclusion by reading the emails. The emails simply show that, when Stokes asked her to confirm her earlier assertion, Youngblood returned to her records, double-checked, and quickly clarified her earlier answer. Youngblood's need to refresh her recollection is far from surprising; indeed, when asked at deposition whether she had taken any intermittent leave prior to her termination, Thomas responded, "I think I took off maybe one day. I don't remember." Dkt. 33-9 at 119 (Pl.'s Dep.). That Youngblood forgot the precise dates of Thomas's intermittent FMLA leave, thus, merely suggests that she was not focused on the FMLA issue at the time she terminated Thomas's employment. In short, if anything, the email exchange between Youngblood and Stokes would seem to undercut Thomas's claim of FMLA retaliation.

With respect to the issue of temporal proximity, Thomas correctly notes that Youngblood approved Thomas's FMLA leave request on October 1, 2012, and that her termination letter was dated only a month later, on November 1, 2012. Thomas's argument, however, confuses the use of temporal proximity evidence to make out a *prima facie* case at the first step of the *McDonnell Douglas* framework, and the use of such evidence "to defeat [a defendant's] proffer and support a finding of retaliation" once it has proffered a non-retaliatory reason for its actions. *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007). For purposes of establishing a *prima facie* case of retaliation, "[t]emporal proximity can indeed support an inference of causation," at least "where the two events are 'very close' in time." *Id.* at 529 (internal citation omitted). But, once a defendant proffers a legitimate reason for its adverse action, temporal proximity standing alone is not sufficient to "defeat the proffer and [to] support a finding of retaliation." *Id.* at 530. At this

33

stage, permitting evidence of temporal proximity to rebut the defendant's showing would be tantamount to "grant[ing] employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim." *Id.* Courts in this circuit, accordingly, require "positive evidence beyond mere proximity . . . to defeat the presumption that the proffered explanations are genuine." *Id.* Here, as explained above, Thomas has presented no competent evidence that the District's proffered reasons were false, nor does she grapple with the fact that it was during the month between when Youngblood approved her FMLA leave and when DYRS terminated her employment that various performance issues arose and the OII issued its finding that Thomas had violated the ethics rules.

The Court will, accordingly, grant the District's motion for summary judgment on Thomas's FMLA and DCFMLA retaliation claims.

## B.      Interference Claims

Under the FMLA, it is "unlawful for any employer to interfere with . . . the exercise of or the attempt to exercise, any right provided" under the Act.  29 U.S.C. § 2615(a).  "To state an FMLA interference claim, a plaintiff must allege facts sufficient to show, among other things, that (1) he was entitled to take leave because he had a 'serious health condition,' (2) he gave his employer adequate notice of his intention to take leave, and (3) his employer denied or otherwise interfered with his right to take leave." *Hodges v. District of Columbia*, 959 F. Supp. 2d 148, 155 (D.D.C. 2013); *see also Elzeneiny*, 2016 WL 3647838, at *5. Yet, significantly, the FMLA does not "protect an employee's job against a legitimate, unrelated, reason for separation." *Hopkins*, 851 F. Supp. 2d at 155.  Thomas and the District, accordingly, agree that an "employer can defend against [an FMLA interference] claim by showing that the employee would have been terminated regardless of the request for FMLA leave." Dkt. 33-1 at 12; *see also* Dkt. 40 at

34

18–19; *Hopkins*, 851 F. Supp. 2d at 155–56 (collecting cases); *Edgar v. JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2007) ("[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct.").

The parties disagree, however, about who bears the burden on this defense. It is settled in this circuit that the plaintiff bears the burden of showing "that her employer 'interfere[d] with, restraine[d], or den[ied] the exercise of or the attempt to exercise, any right provided' by the FMLA." *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 7 (D.C. Cir. 2010) (quoting 29 U.S.C. § 2615(a)(1)); *see also Gordon v. U.S. Capitol Police*, 778 F.3d 158, 164 (D.C. Cir. 2015). But the D.C. Circuit has not addressed whether the *McDonald Douglas* framework, under which the ultimate burden remains with the plaintiff, *see* 411 U.S. at 804–05, applies to an FMLA interference claim, and courts from other circuits are divided on this issue, *compare, e.g.*, *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (explaining that the "district court correctly applied *McDonnell Douglas* to both [plaintiff's] interference and retaliation claims"), *with, e.g.*, *Bachelder*, 259 F.3d at 1131 (explaining that "there is no room for a *McDonnell Douglas* type of pretext analysis when evaluating an 'interference' claim under" the FMLA). Here, the Court need not resolve this issue because, even if the *McDonald Douglas* framework does not apply, and the employer has not only the burden of production, but also "the burden of proving that [the] employee dismissed during FMLA leave would have been dismissed regardless of the employee's request for leave," *Hopkins*, 851 F. Supp. 2d at 156, the District is entitled to summary judgment on Thomas's interference claim.

Assuming for present purposes that the District bears the burden of proving that Thomas would have been dismissed regardless of her request for FMLA leave, the Court must still apply

the traditional rules applicable at summary judgment. Under those rules, a defendant may meet its burden by producing competent evidence showing the absence of any genuine dispute of material fact for trial. *See* Fed. R. Civ. P. 56. After "a properly supported motion for summary judgment is made," the burden then shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250 (internal quotation marks omitted). To carry that burden, moreover, the nonmoving party must offer more than a "mere existence of a scintilla of evidence," *id.* at 252, unadorned speculation, *see Hutchinson*, 393 F.3d at 229, or conclusory assertions, *see Ass'n of Flight Attendants-CWA v. Dep't of Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009). "[T]he nonmoving party must," instead, "come forward with specific facts showing that there is a *genuine issue for trial*," *Matsushita Elec. Indus. Co., Ltd. v Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (emphasis in original); that is, she must show that "the evidence is such that a reasonable jury could return a verdict" in her favor, *Liberty Lobby*, 477 U.S. at 248. Here, Thomas has failed to counter the District's "supported motion for summary judgment" with any such evidence. *Id.*

As explained at length above, the District has offered ample evidence that Thomas was dismissed for reasons unrelated to her request for FMLA leave. *See supra* pp. 16–30. The sole question, then, is whether Thomas has identified any evidence that would permit a reasonable jury to reach a contrary conclusion. According to Thomas, she has not only carried this burden, but has shown that she is entitled to summary judgment because the undisputed evidence shows that she was discharged "'not for cause.'" Dkt. 33-1 at 12 (quoting Dkt. 26-5 at 7); Dkt. 47 at 3. But, as explained above, that contention confuses "not for cause" with "without reason." *See supra* p. 26. An at-will employee can be dismissed without a finding of wrongdoing,

insubordination, or incompetence. *See* D.C. Code § 1-609.54; *see also* D.C. Mun. Regs. Tit. 6-B

§ 1600.3(g) (2012). That does not mean that the employee's supervisors had no rationale for

their decision or that they acted in an entirely arbitrary manner. Here, the District has explained

its reasons, and, as discussed above, Thomas has failed to cast doubt on that explanation.

For all of the reasons explained above, *see supra* pp. 16–34, there is no genuine dispute

that Thomas was discharged for reasons unrelated to her plan to take FMLA leave. The Court

will, accordingly, grant the District's motion for summary judgment on Thomas's FMLA and

DCFMLA interference claims, and will deny Thomas's cross- motion.[11]

## CONCLUSION

For the foregoing reasons, the Court will grant the District's motion for summary

judgment, Dkt. 26, and will deny Thomas's cross-motion for summary judgment, Dkt. 36.[12]

A separate order will issue.

RANDOLPH D. MOSS
United States District Judge

Date:   December 30, 2016

---

[11] In her motion for summary judgment, Thomas alleges that the District's FMLA violations were "willful and intentional" and argues that she is entitled to liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(ii). *See* Dkt. 33-1 at 32–33. Because the Court will grant the District's motion for summary judgment, it follows that Thomas's request for liquidated damages fails.